Good morning, Your Honors. John Burton for the plaintiff and with me today is my co-counsel John Patahi. I'd like to reserve four minutes for rebuttal including to address qualified immunity if that's appropriate. The district court granted summary judgment for Orange County based on the pleadings alone without reaching the merits which were fully briefed on a motion for summary judgment after discovery. That ruling dismissing Plaintiff's Monel claim should be reversed for three reasons. First, the first amended complaint which I drafted and I've been in this field a long time was adequate under the notice pleading standards required by Rule 8 and specifically endorsed by the Supreme Court in Leatherman and more recently in the city of Shelby case. The simple omission of jail nurses from the list of state actors in paragraph 49 who were alleged to be inadequately trained on recognizing signs of stroke and confusing them with alcohol intoxication. Is your theory that the intake nurse needed to realize he was having a stroke or just should have referred him to someone else who would have realized? Absolutely the latter, Your Honor. Absolutely. The nurse is a registered nurse. She is not qualified or allowed under state regulations which are mirrored in the county policies to diagnose. That would be a diagnosis. She's like a triage nurse when someone walks into an emergency room. Very quickly find out what level of medical screening is required. In this case, and thank you for focusing on what's really the essence of this case, she had options. Number one, and this happens, she testified once a shift that often. She simply tells the arresting officer there might be something going on medically with this inmate, this prisoner. Take him to the ER. That's called a refusal. There's a form of procedure. Number two, there is a doctor and a nurse practitioner, which are collectively referred to as medical providers, that are allowed to diagnose what was going on. The only question here was whether he should have been medically screened by a provider. To the extent you're challenging a policy, like a written official policy of the jail or county, it's that without a head injury, there was not a required referral? Right. The policy was way too general to pick up all the different kind of neurological disorders that could be presented in a jail inmate and confused for intoxication. There's diabetic shock. There's seizure disorders. And then, of course, what happened here is a stroke that was underway in an individual who may be to some people who are not doctors and don't understand subtleties like Moyamoya disease would think is not somebody who would be having a stroke, a 39-year-old, otherwise healthy young man. So the problem is there was simply inadequate policy and an inadequate practice of taking people who might be drunk, but there might be something else going on instead. You indicated that the county and its policy with respect to the intake nurse embraced essentially what the Practice Act was for the nurse under California law. What else do you say the county should have done beyond what the Practice Act already required her to do? The county should have trained Nurse Barbary that when a prisoner presents with a highly abnormal cognition and possible neurological deficits, that you should take a moment and either send that prisoner to the ER or have them looked at by the doctor or the nurse practitioner who are in the next office and not admit him into the general population where he remain unmonitored for 22 hours while a stroke or other condition progressed, which is what happened in this case. And what happened? Was that consistent or inconsistent with what the Practice Act would have required anyway? The Practice Act prohibited the intake nurse from making a diagnosis. That's why all this about whether he had risk factors or whether these were signs of a stroke or something else are not relevant in this case. What was relevant was, is this a person who presents as too cognitively, too neurologically disturbed to go into the jail population without a proper medical protocol screening, which puts it on all fours with cases like Gibson versus County of Washoe, in our view. So I know you have challenges to the jury verdict against Barbary, but if we just assume for a moment that you would lose those and assume the jury had a proper verdict against Barbary, would that mean that the policy for the intake would also have to lose the policy challenge? Absolutely not. And thank you for that question. Luman versus Farrelly, another jail case, 100% on point. In that case, the jailers were exonerated. Let's not talk about any other cases. So I know there are a lot of cases with lots of different reasons why the policy may not match what the people did. Let's just talk about this case. What would be the theory by which Barbary could be not liable, but there was a problem with the policy? It was argued by the defense at the trial, and we cited it in our brief. Hey, she was just following her training. She was following the policy. You can be angry at the county, okay, but Barbary is a defendant. And she did exactly what the county told her to do. And it was followed- I guess she did exactly what the practice act told her to do, because that's what the county's policy was. No, because the county policy and the practice act, those are not the same. The county policy said that nurses cannot diagnose, but the county policy was defective in other respects. And the county representative, Nurse Broadwater, testified that nurses are allowed to diagnose. That was evidence at trial showing that the policy and that practice in the jail was actually different than the practice act. But I would like the court to reach the merits of the Monell claim. It doesn't have to. The district court on summary judgment did not reach these merits that we're discussing now. It was dismissed on these pleading grounds. And we think for three reasons, one, that the complaint was adequate. Number two, that the plaintiff's discovery responses filled any possible gaps. There was quite a bit of discovery, a very explicit interrogatory response. I want to ask back on your answer just a moment ago about the reason the jury might have ruled for Barbary was just she was sort of following the policy and really it's the policy that's the problem. If that was argued to the jury, that wouldn't really be correct, right? Following something that's obviously unconstitutional would not be okay, even if it is the policy. So how, I mean, should Barbary, if the policy is obviously unconstitutional, should Barbary have recognized that in this? So that would mean the jury couldn't rule for Barbary. Not necessarily because she was following her training or policy and it didn't end with Barbary's decision, the Monell claim. She testified that she was referring him to medical monitoring, but for the next 22 hours, he had no medical monitoring. He was completely ignored. I think that that's a separate part of your Monell claim is like when he was evaluated 12 or 14 hours later, they should have realized, and that has nothing to do with Barbary, but that's a kind of a separate theory in your Monell theory. Well, I wouldn't say separate, but we think that it was collective inaction and indifference in this jail to the medical condition of arrestees, which is not something that we invented for this case. It was found by the Department of Justice. It was found by an ACLU report. It was found in a grand jury report and has been the subject of several cases that this circuit has decided. Most recently, the Gordon case, which became final three months before this incident and involved a failure to adequately screen an inmate in actually the same facility, the same place. Could I ask, if you'd had more than three hours, what else would you have presented that would have helped? Well, I've been doing these cases a long time. I did the first trial. We hung 4-4. I would have done the second trial, but my community, I live in Altadena directly north of here. We lost 6,000 of our 10,000 homes, and I simply could not go to trial two weeks after the fire. I couldn't even get to my wardrobe. I read that in your briefing. It's very sad. I'm very sorry for all of those losses. So my good friend, Dale Gallipo, who does more of these cases than all of us put together and is the most efficient trial lawyer I've ever seen, we agreed it required 9-11 hours for a plaintiff to present a case with this kind of brain damage, $450,000 worth of medical bills, 54 days of hospitalization, 30 days unable to talk, challenges on liability, whether like we're discussing about. The causation issue here alone merited two to three hours. We had a Stanford clinical professor of medicine named Chitra Venkata Subramanian, one of the world's authorities on Moyamoya, and we had to have the jury understand this very complex idea that, of course, he had the initial brain infarcts and the penumbral stunning of his neurons from the stroke, and of course, the jail and the police officers and the paramedics didn't cause that damage, and there would have been some residual from that, but what was the injury from the 22 hours of him sitting dehydrated in the jail before he got to the emergency room, and what were the therapies that would have helped, which turns out to be lower the viscosity of the blood, get IVs going, get blood thinners and anticoagulants so that blood can profuse to those areas of the brain. Are these examples of things that you didn't get to present or that you had to present in a sort of cursory and abbreviated fashion? We knew going in we had three hours, Judge Miller, so we tailored our case like a triage nurse, okay, what's the most important thing that we can raise and how can we raise it, but we were unable to present the case properly. It would have taken nine to 11 hours alone for a plaintiff to present a case of this complexity to a jury. Is that a product, because I think that Judge Friedland's question or at least mine is if you could give some examples of things that you would have presented but weren't able to, is it more time with the witnesses you had or are there some other witnesses that you would have put in? The big thing is more time with the witnesses we had. Dr. Subramanian got up there and said, well, he would have gotten out after three or four days. He would have had very low, if any, residuals. Instead, he was in for 54 days with these horrific residuals. She was able to give that opinion because that was the most important thing for us to put up there, but she was unable to explain the foundation for her opinion because there simply wasn't time to do that. There were two foundations. Number one is the general medicine because we have to educate the jury as to how to understand what ischemic strokes do and how they result and what this strange disease Moyamoya is all about. We also had to explain why did she think after her review of all the scans, the MRIs, the regions of his brain, the multiple infarcts he had, their sequence, why did this magnify or aggravate his preexisting injury? Did you have evidence that if he had been referred earlier to a provider, that the provider would have been able to tell that this was a stroke? Yes, that was what Dr. Venters, our correctional medical specialist who was the former director at Rikers Island, was testifying to, that any competent medical provider would have seen that this was not alcohol intoxication. These were signs of a more significant- In very conclusory form, but without explaining the why. I'm just trying to understand what the jury verdict might mean. The jury must have thought that even though that expert testified that any reasonable provider would have recognized this, that they believed it was reasonable for Barbary not to? What the jury verdict means to me, Your Honor, is that the party with the burden of proof is going to lose when there's no time to present a case at trial. The three hours that we were given, the court took the bench at nine, we would be halfway through the amount of time that we had for three experts, because there was also the neuropsychologist who did two days, eight-hour days of cognitive testing, who was given two minutes to get up there and say what his conclusions were and not explain what the basis of his conclusions were. So we had the experts- Did anyone testify as to what would have been the reasonable actions or responses of an intake nurse as opposed to the medical provider down the line who presumably is what was being addressed by the experts that you've been telling us about? Dr. Venters, that was his primary opinion, was that the intake nurse should have noted things like he could not talk, he was dragging his leg, he had tremors, et cetera, and referred him to a medical provider who could diagnose- At that time. At that point, which is 9.48 a.m. on the 16th, which was within three hours of the automobile accident that was caused by the stroke, or within four hours, and I see I'm over my time, and I really appreciate the panel's questions. I think they're going right to the heart of this case. Can I ask another question about how the time limits worked? So your three hours was your direct examination of your witnesses, your redirect, the defense cross-examination of your witnesses, was that their time or your time? That was their time. Our cross-examination of their witnesses was also part of our three hours. Okay. And time spent dealing with objections to questions? That was our time if it came up, and that came up several times in the retrial where the evidence that came in the first trial, by stipulation, they objected to the second trial, then it would take five or 10 minutes to sort that out. On their time? On our time, because it was during our case. Their objection, no? Although it was their objection, I mean, this was not a fair trial. This was not a reasonable trial. This was a complex brain injury case that was life-changing for our client, and it was basically tried in two days, and without any sort of adequate opportunity for skilled trial lawyers, especially Mr. Galippo, to present a case properly. And I would just invite the court's attention to Professor Engstrom's excellent article, which we cite in our brief from the Georgetown Law Review, on the overall issue of time limits and the decision of the Hawaii court, which we quote, that just, the case has to be analyzed and the time limits need to be reasonable given the complexity of the issues. I would like to just talk very briefly about the excluded evidence, if I might. I think because we have you well over your time, why don't we hear from the other side, and I'll still give you three minutes for rebuttal. Thank you, Your Honor. Good morning, Your Honors. My name is Craig Smith on behalf of Appellee's, Nurse Yvette Barbary in County of Orange. Nurse Yvette Barbary, sweetheart of a woman, has dedicated her life to public service, first as a 911 dispatcher, then later in her life became a nurse, and then began to work for the County of Orange. As the record reflects, in 2021, during COVID, she was doing the intake triage. This case, I'd like to jump to the time limitations, if we can, was a very simple, straightforward case that involved the 12-minute triage that Nurse Barbary did, and how the triage was conducted, the policy with respect to admission of pretrial detainees, the intake that is done by the triage nurse, and the policies, guidelines, and the standard of care that follows. Now, what is important here is that my appellant's counsel has focused on the inability to present his damages as why he was prejudiced, but what the record reflects is that the damages portion of the trial went uncontested. Defense didn't even present their standard of care expert at the time of the close of the trial. The three-hour time limit had expired on both parties, and when defense asked for time to present its case, the court gave defense 90 seconds to present its expert neurologist to discuss its rebuttal to the causation issues, and was barely able to provide any testimony, but the point that's so important to look at the record and see is that there is not a single piece of evidence that appellant can point to that they were not able to present due to the time limitations that was probative and would have changed this verdict. Right, but I mean, I think the point that's being made is that they got in everything after a fashion, but there's sort of some complex issues of causation. They do have to, they don't know that you're not going to contest damages, so they have to put in some evidence on that. And they aren't able to sort of present it in a way that actually makes a whole lot of sense to the jury because they have to sort of go through everything in a really abbreviated way. I think it made perfect sense to the jury. It was very easy to understand, and the record reflects that. That Sean Porrio, he sustained a stroke on the date of the incident due to Moyamoya disease. It was confused for intoxication. He had further ischemic strokes resulting in his hospitalization. He had to stay in the hospital for a significant amount of time. He was present at the trial, and he testified, and it was clear what his damages were from the impendent stroke. Just from his own testimony, he had a very difficult time answering questions. He had sustained significant life-altering damages, and Apelli didn't challenge that and didn't challenge that they were caused. It's not obvious to a layperson, number one, that it should have been apparent to somebody that this was, when it was happening, that it was a stroke and not intoxication. It's not obvious to a layperson looking at him after the fact that the damage is a result of the 22-hour delay rather than just an inevitable consequence of the stroke once it happens. I take the point that you weren't able to put in a lot of evidence either, but if both sides are really constrained, then the party that has the burden of proof on these issues is going to lose, right? I disagree with that because the imposing time limits, even significantly less time, doesn't constitute an abuse of discretion if they were able to put on a fair trial, and they were. Apelli, nurse Barbary, despite being entitled to qualified immunity, had to endure two trials in which she was accused of being deliberately indifferent to a pretrial detainee's constitutional rights. They were very short trials, though. Short trials, but yet trials in which she was losing her hair, losing sleep beforehand, in which she is entitled to qualified immunity, which was challenged at every stage of the proceedings. However, our interlocutory appeals weren't able to be heard because they were denied under Truman, and the trials proceeded forward. Wait, wait. You're speaking very quickly, so I want to follow up on two things you've said. For one, the idea that this trial was a reasonable length. I'm looking for the exact number, and I'm having trouble finding it, but I thought that you asked for something like 15 hours or 19 hours of your time. We simply just had time estimates of witnesses as- And doesn't it add up to something like 17 hours? Yeah, but those weren't actually reasonable, adequate. Look, the time limitations were preservation of rights that litigants do all the time before trial. They list out all the possible witnesses, which include treating physicians that might need to be called, depending on how the trial goes, and usually you put a .5 next to each one, and you estimate the time. But we didn't need all of that time to put on our case in chief. Plaintiff presented his case, like he said, with the trial attorney, Dale Galipo, all-star trial attorney, civil rights lawyer. He put on an extraordinary trial. I would urge the court to look at the transcripts. It is very clear and concise as to what the arguments were that appellant made and why they believe that my client was liable, and it was a short 12-minute triage video that needed to be analyzed, and we played the beat. Was there proof of what happened after Nurse Barbary had performed her services, what happened inside the facility between that time and when DeCorio actually sees a medical provider? There was testimony that he had multiple further ischemic strokes and that he was then found manned down and then transported to the hospital. That is reflected in the record. And, look, they had an adequate, fair trial here in which they used their time efficiently. They cannot point to a single piece of evidence that they were unable to present to the court that would have changed this verdict. Would it be fair to say that the jury was hearing evidence about the, let's call it, the negligence of other people at the facility and provided an opportunity for the jury to find Nurse Barbary because the bad conduct occurred later? We did not put on a case in chief that they should find for Nurse Barbary due to negligence of individuals later, and there wasn't significant testimony in that regard. That's the facts I was asking about, whether or not the jury heard in this case put on by either side that after DeCorio leaves treatment examination by Nurse Barbary, X, Y, and Z happen? Yes, the jury heard what happened after he left the triage booth with Nurse Barbary. What was relevant for the determination was the triage video, the question air that the county of Massachusetts utilizes, and the responses to that, and whether Nurse Barbary was deliberately indifferent to his constitutional rights. That was the only issue that was being tried. It was one sole defendant. This was not a complex case whatsoever involving- Because the Monell claims were already out. It was just against Barbary. Yes. Yeah. So it was a very easy trial, and Nurse Barbary prevailed on the liability prong, and they're focusing on their inability- How do we know that? Do we have a special verdict? How do we know? Yeah, we have a general verdict that says, did Nurse Barbary fail to provide Sean Porio with needed medical care? Answer, no. I believe I quoted it almost verbatim, if not verbatim. And so the jury found that Nurse Barbary did not- The question was in the affirmative. Did Nurse Barbary fail to provide Sean Porio with needed medical care? Question, yes or no, and the jury found no. And that was the only question before the jury, and they're focusing on causation and damages when, in fact, she had a verdict for liability, and so- The three hours needed to cover everything because they wouldn't know in advance what the jury was going to think. But it was uncontested that he suffered damages as a result of this. But the jury would have had to find a number. They would have had to know how much medical care he needed and everything. It's not just yes or no damages. Sure, and the record reflects that. They were able to present all the evidence as to what the number was. In the first trial, they asked for $30-something million, and in this trial, I believe Mr. Galipo asked for potentially a million dollars a year for the rest of his life. And they had these calculations based upon their expert witnesses. They were able to present that testimony, and it went uncontested by defendants. Defendants did not contest the fact that he sustained damages as a result of not being referred to a higher level of care. But I think you were contesting what the symptoms should have seemed like to a competent provider, whether this should have been identified as stroke. I mean, a lot of things about the symptoms of various conditions, right? Yes, and we had the video that I played utilizing our time. The jury watched the entire video and then heard testimony from Nurse Barbary as to what she did and then heard from their standard of care expert, Dr. Venters, for a significant period of time as to his opinion that she should have referred him to a higher level of care and did not hear any testimony. It went unrebutted from our standard of care experts, so there was no prejudice to them. The testimony with respect to things that happened at the jail after Nurse Barbary, that was on the plaintiff's time? Doug, excuse me. Can you restate the question? I understood from an answer you gave to me that there was testimony at the trial regarding what happened to Mr. Corio after Mr. Corio went into the facility after Nurse Barbary did her initial assessment. Yes, and it might have been a mix of the time between the parties. I don't know the exact amount of time that was spent on that because really the focus here is on what- And there was no Monell claim pending, but that testimony went in anyway. And that's why that type of evidence wasn't probative in the first instance because it was what Barbary knew and whether she acted objectively reasonable under the totality of the circumstances, not what all of these other individuals down the line did. That was not before the court. When you were saying that a standard of care expert for the other side testified about how you would identify that there was a stroke here, you said it was uncontested, but that doesn't make sense with why the jury would then rule for Barbary. It would make sense because, look, that expert was cross-examined, and so there was cross-examination, but it went uncontested in the sense that we didn't put on our expert with respect to standard of care. So I don't want to confuse the issues here. Certainly, we cross-examined their expert and the jury didn't find their expert to be credible. You were satisfied with your cross of the plaintiff's expert. Yeah. The cross-examination of plaintiff's expert must have been persuasive because they found Nurse Barbary and then also Nurse Broadwater, who was the person most knowledgeable, their testimony to be credible, which supports the verdict. And the verdict is not being challenged for insufficiency of evidence. You're using uncontested in a very curious way here, I think. I mean, and the underlying substantive point is, I mean, you're opposing their position on these issues through cross-examination, which does suggest, does it not, that it might have been useful for them to be able to draw out more evidence in their affirmative case. It might have been useful. It just would have been duplicative and cumulative and would have just been piling on and on. They can't point to any piece of evidence that they would not have been able to present, whether it be on the issue of liability or damages. And again, we have somebody who's a nurse here who is entitled to qualified immunity. I wanted to follow up on this. This is the second point I want to follow up on. You said very quickly in passing, we raise this at every stage, but can you point to any time when you raised it during the second trial? Yes. We, at the close of their evidence, when they rested, we said, we have a motion to make, Rule 50A motion. And the court said, okay, thank you. We will reserve that and you can file briefing later. Do you rest? And we said, no, we don't rest, Your Honor. We would like to present our witnesses. And he said, well, time is up. You've utilized your three hours. We utilized it in cross-examination of their witnesses. I set forth that we did have a few minutes left. The judge gave me 90 seconds to put on our neurologist. I went to the hallway. I got our neurologist. Our neurologist testified for approximately two minutes. I've lost the trail of the qualified immunity. So we did preserve it by moving under Rule 50A. And then we obtained a verdict in our favor. And so we didn't file a Rule 50 motion because the Rule 50 motion didn't move. Weren't there qualified immunity questions on the verdict sheet? We submitted them and they were denied. So we submitted special interrogatories and special verdict forms. That never went to the jury? It never went to the jury because the court refused to... But it was submitted? It was. It's on the docket that we submitted special... There was a denial by the court of your request to send in a special interrogatory in the case that there was a verdict for the plaintiff? Correct. Correct. And in proposing that, did you argue clearly established law was the reason that this case should not go forward? Absolutely. It was in our motion for summary judgment that on the record, which they contend was granted improperly for the county. And then we filed an interlocutory appeal. Then they filed a Truman motion and the trial went forward. Then the first trial resulted in a hung four to four trial. We filed a Rule 50 motion then asserting qualified immunity. It was denied. We then filed another appeal. And we had then two appeals pending. Then they filed this appeal after the verdict and we filed a motion to consolidate all three appeals. And the record will reflect that they then filed an opposition to the motion to consolidate the three appeals at a motion to dismiss the two pendant appeals as being moot due to the fact that there was a verdict for Nurse Barbary and that we could raise the issue in our answering brief. And that was what we then did is raise the issue in our answering brief. So it was raised a motion for summary judgment, Rule 50A after the first trial was hung. But for the second trial, do we need to agree with you that just saying 50A is enough to argue qualified immunity? Certainly when looking at the totality of the record, absolutely. The court knew exactly what the basis was for our Rule 50 motion because we had moved for it already before the same judge on the same facts for the first trial and at the time of summary judgment. So the court was well aware of the basis for the Rule 50 motion that would have been filed had the verdict not resulted for Nurse Barbary. And the special interrogatories were in the second trial? That's correct. Special interrogatories were submitted in both trials. Can I ask you quickly one question on Monell? So the basis for the district court's grant of summary judgment on that was that the plaintiff had not adequately put you on notice that they were asserting claims based on the intake policies rather than police and firefighters. Can you address the plaintiff's response to the interrogatory that you propounded where they seemed to say that they were basing the claim on failure to train intake nurses? What significance does that have in assessing this? You know, it can't constitute an amended complaint in our position and certainly not where they served it on the date of the discovery cutoff. And it was an amended response to contention interrogatories after meet-and-confer efforts were done to try to determine what their contentions were because we found their initial interrogatories to be insufficient. So the record reflects the contention interrogatories were served just 28 days before our motion for summary judgment. And that was a delay that is not... You didn't seek more time though in light of the response, did you? We didn't seek more time in light of the contention interrogatory responses. We filed our motion for summary judgment and we believe that even if the court reviews it de novo, that there's no genuine material issue, no tribal issue material fact. So our position is that the contention interrogatories were served way late in the litigation, past the deadline for which there was a permissible date for amendment of the pleadings, just 28 days before our deadline to file our motion for summary judgment and just a few months before trial actually took place. And that contention interrogatories under these circumstances shouldn't be permitted to constitute an amended complaint. Thank you. Let's put, I think I said three minutes. Thank you. I'd like to start with qualified immunity. The interrogatories to the jury, I think are irrelevant in this circuit. We typically don't do that. The issue was not preserved because the 50 motion stated zero grounds, nothing, just rule 50 motion denied. To preserve the issue would have required a 50B motion and an analysis by the court. Number two, the record should be included of a trial of reasonable length and also have included the excluded evidence, which was a body camera video of our client taken right before he went to jail, which showed he absolutely could not talk. He could not answer any questions. He had tremors. He was lethargic, all sorts of signs that were not typical intoxication signs, but were signs of a typical neurological disorder. Those should have been in the record and those should be considered as well. The law, I think the district court for all its rulings against this got this one right and found that middle Gibson versus Washoe County requires adequate screening, Sandoval, and then the Gordon litigation, which had just happened, that fair to conduct appropriate screening so that protocol is initiated is a violation of the 14th amendment. There is no clearly established issue here. Very quickly, they certainly did contest damages. I just invite the court to 5ER904. Their expert neurologist, Thomas Hemond, MD, said that there was a complication from the revascularization surgery that happened a month after he got out of the rehab hospital that was due only to the Moyamoya disease, had nothing to do with the delay, and that he said there is no difference between the result that Mr. Porrio has today that is attributable to the 22-hour delay in the initiation of the stroke protocols. That was their testimony. In terms of what happened in the jail after the triage, there was no evidence. In fact, we have video of him shuffling around, falling down, the not being able to submit to a booking photograph 14 hours later, not being able to get fingerprinted. That was all excluded along with the video showing how he was right before he got to the jail. And the nurse, Barbary, said, I referred him for further medical assessment. They argued he was getting further medical assessment. We tried to prove he didn't, but because of the three hours and the way that the trial unfolded and the denial of our ability to bring the Monell claim to the jury so that it had the whole picture, we were unable to do that. So the question on the verdict form included this very troubling question of causation. During the trial that hung 4-4 that I did with Mr. Fatahi, the jury came out with a question because they were clearly disturbed by the fact that the county did not, and the nurse, did not cause his stroke and that he was going to have a problem anyway. The problem was really, did the delay cause an injury, an additional injury? That was a very subtle question. That's why we hired Dr. Venkata Subramanian in the first place, because it was just a very complex, difficult question of neurology that needed to be addressed at some length. And it also had to do with what residuals does he have today that are attributable to the delay, and what is attributable to the fact that he has this horrible moyamoya condition, which just seems to randomly afflict a small number of people in their adult years like him. So... Have you over your time, so if you could wrap up, that'd be great. I just would urge the court to look at the whole picture here, that this was a very, very serious case, and that plaintiff was simply not able to exercise his Seventh Amendment right to have a jury decide it in a professionally conducted adequate trial of 9 to 11 hours with the Monell claim along with the individual claim and all the relevant evidence, including the triage videos. I think when you put all this together, this cries out for reversal and a fair trial. Thank you very much for your consideration. And... Thank you both sides for the helpful arguments. This case is submitted, and we are adjourned for the day. This court for recession stands adjourned.
judges: FRIEDLAND, MILLER, Vitaliano